**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CQ, INC.,

      Plaintiff,

v.                                                              Civil Action No. 3:06-CV-322-B

TXU MINING COMPANY, L.P., et al.,

      Defendants.

# Expert Report Of

# Quentin L. Mimms

March 2, 2007



## INTRODUCTION

### Scope of Retention

1.  Hunton & Williams LLP, on behalf of TXU Mining Company, L.P. ("TXU Mining") and TXU Corp., (collectively "TXU") retained Navigant Consulting to analyze damages, if any, that CQ, Inc. ("CQ") suffered due to 1) TXU's decision to not use CQ to build and operate coal cleaning operations at TXU-owned lignite mines in East Texas and 2) TXU's alleged theft of CQ's trade secrets.

2.  I am a Managing Director in the Dallas office of Navigant Consulting, an independent consulting firm providing litigation, energy, financial, healthcare, and operating consulting services to government agencies, legal counsel and companies. Navigant Consulting has approximately 1,800 professionals in over 40 offices throughout the United States, as well as Canada, Europe and Asia. I am experienced in financial, economic, damage, and accounting matters related to the scope of our work on this matter. I have consulted on intellectual property licensing-related matters and have prepared and analyzed a variety of claims for royalties, lost profits, and other economic impacts. My resume, which is included as Attachment 1, provides additional information on my education, certification, and experience. Attachment 2 provides a list of cases in which I have offered testimony during the last four years; I have no publications within the last ten years.

3.  The research and analysis upon which I have based my opinions outlined in this report have been performed by me or by personnel working under my direction and supervision. Navigant Consulting's compensation on this matter is



based on hourly rates ranging from $100 to $450, plus job-related expenses. Navigant Consulting's billing rate for time I incur on this matter is $450 per hour. The firm's compensation in this matter is in no way contingent upon the outcome of this litigation.

### Information Considered

4.   Attachment 3 provides a list of the documents and information I have considered in preparing my report and supporting analysis. Selected pages from the documents and information considered may be used as exhibits at trial. Additionally, I may prepare graphical or illustrative trial exhibits based on the documents and information considered and/or my analyses thereof. Further, I may supplement and amend the opinions in this report in response to additional information received or to address issues raised by other witnesses. My deposition and trial testimony may also supplement this report.

### SUMMARY OF CONCLUSIONS

5.   Based on my education, experience, and review and analyses of the documents and information provided to date in this matter, I have formed the following conclusions:

- CQ's lost profits damages claim is speculative, unsupported, and unreasonable.

- CQ has quantified no reliance damages.

- CQ's damages claim related to the alleged theft of trade secrets is unsupported and unreasonable.

NAVIGANT
CONSULTING

2

BACKGROUND

**Entity Descriptions**

**CQ**

6.   In 1990, CQ was formed as a wholly owned subsidiary of the Electric Power Research Institute ("EPRI") and became an independent, employee-owned company in 1994.[1]  EPRI was founded in 1973 as a member-based energy and environmental nonprofit research organization whose members represent over 90 percent of the electricity generated in the United States.[2,3]  CQ provides consulting and outsourcing services related to coal cleaning; develops, produces, and utilizes alternative fuels; and applies finishes to hardwood flooring.[4]

**TXU**

7.   TXU Corp. is a Dallas-based energy company engaged in electricity generation, electricity sales, wholesale energy trading, and regulated electricity transmission and delivery.[5]  TXU Corp. is comprised of two reportable segments: TXU Energy Company LLC, which contains the electricity generation, electricity sales, and wholesale energy markets activities, and TXU Electric Delivery

---

[1] CQ, Inc., Web site <http://www.cq-inc.com/about.htm>.

[2] EPRI, Annual Report, 2005, introduction; EPRI, "Introducing Electric Power Research Institute," February 2007.

[3] TXU has been a member of EPRI for a number of years.  Discussions with Kasie Pickens, January 12, 2007.

[4] CQ, Inc., Web site <http://www.cq-inc.com/producers.htm>; Clark Harrison, Deposition Testimony, August 8, 2006, 22 – 24.

[5] TXU Corp., Form 10-K, December 31, 2005, 1.

NAVIGANT
CONSULTING

3

**APP 4**

Company, which contains the regulated electricity transmission and delivery operations.[6]  TXU Mining is a subsidiary of TXU Energy Company LLC.[7]

## Electric Power Industry Overview

### Fuel Sources for Electric Power Generation

8.   Electricity generation is fueled by coal, petroleum, natural gas and other gases, nuclear power, hydroelectric, and other renewable energy sources.[8]  For the period 1994 through 2005, coal accounted for over 50 percent of electric power generation, followed by nuclear power at approximately 20 percent.[9]  Coal exists in four types:  anthracite, bituminous, sub-bituminous, and lignite.[10]  Lignite, also known as brown coal, is the lowest grade of coal due to its high moisture and mineral matter content.[11]  Powder River Basin ("PRB") coal is a sub-bituminous coal known for its low sulfur content.[12]

### Deregulation

9.   In 1999, the Texas legislature enacted the Texas Electric Restructuring Act, which deregulated the Texas electric generation industry to create a competitive

---

[6] 2005 Form 10-K, v, 6.

[7] 2005 Form 10-K, v.

[8] Energy Information Administration, Electric Power Annual Report 2005, Chapter 1, "Generation and Useful Thermal Output," November 2006, 13 <http://www.eia.doe.gov/cneaf/ electricity/epa/epa_sum.html>.

[9] EIA, Electric Power Annual Report 2005.

[10] <http://www.rocksandminerals.com/coal.htm>.

[11] Energy Information Administration, "Glossary: Lignite," < http://www.eia.doe.gov/glossary/ glossary_l.htm>.

[12] <http://www.rocksandminerals.com/coal.htm>.



APP 5

market for retail electric power, effective January 1, 2002.[13]  In response to the Restructuring Act, TXU restructured its business into a transmission and delivery operation, which remained a regulated business, and a power generation operation, which was subject to competition.[14]

### Coal Cleaning

10. Coal cleaning refers to the process of removing impurities such as sulfur, ash, and rock from the coal.[15]  The wet cleaning process uses water or other fluids to separate the impurities from the coal while dry cleaning uses air, vibration, or other non-liquid means.[16]  The benefits of coal cleaning include decreased sulfur emissions, increased Btu output, increased consistency in coal quality, and lower power plant maintenance costs.[17]

### TXU's Electric Power Generation Operations

### Sources of Fuel

11. TXU, through various subsidiaries, generates electric power using nuclear, coal, and natural gas plants and also purchases electric power on the wholesale

---

[13] Energy Information Administration, "Status of State Electric Industry Restructuring Activity, As of February 2003," 101 <http://www.eia.doe.gov/cneaf/electricity/chg_str/restructure.pdf>; Texas Legislative Council, "Energy and Utility Regulation," Summary of Enactments, 76th Legislature, Regular Session 1999, September 1999, Chapter 1, 137 < http://www.tlc.state.tx. us/pubssoe/76soe.pdf >.

[14] TXU Corp., Form 10-K, December 31, 2002, 1.

[15] Environmental Protection Agency, Overview of Coal Cleaning, 1 [David Akers Deposition Exhibit 134].

[16] Richard James Snoby, Deposition Testimony, December 29, 2006, 5 - 7.

[17] TXU Presentation of Dry Cleaning for Texas Lignites, November 2000, 30; Coal Preparation for North Dakota Lignite, January 24, 2002, 5, 17.



market.[18]  As Table 1 indicates, coal accounted for approximately 35 percent of TXU's electric power needs during the 2002 – 2005 period.  Lignite represented approximately 70 percent of the coal source fuel.[19]

**Table 1.  TXU Electric Power Generation/Purchase by Source**[18]



Source: TXU Corp., Forms 10-K, 2004 - 2005.

12. TXU Mining operates nine lignite mines and transports its lignite production to TXU coal-fired power plants at Big Brown, Monticello, and Martin Lake, where the lignite is supplemented with purchased PRB coal.[20]

---

[18] TXU Corp., Form 10-K, December 31, 2004, A-30; 2005 Form 10-K, A-28.

[19] 2005 Form 10-K, 8.

[20] 2005 Form 10-K, 8.

NAVIGANT
CONSULTING

## Clean Coal Key Alliance

13. Due to competition in the electric power generation industry and environmental concerns, TXU began exploring whether coal cleaning to improve the quality and reduce the emissions of its relatively low-cost lignite would be economically viable.[21] On November 10, 2004, TXU Mining issued a call for proposals for a "clean coal key alliance" to "develop and implement clean coal processes for TXU's lignite facilities."[22] The call for proposals envisioned an initial performance period of five years, after which the parties would either negotiate an extension of the alliance or TXU would acquire the facilities built under the alliance.[23] The scope of work outlined in the call for proposals included: 1) the potential construction and operation of a lignite cleaning plant at the Twin Oak Mine, 2) the potential construction and operation of a lignite cleaning plant at the Martin Lake Oak Hill Mine, 3) the potential construction and operation of cleaning facilities at other existing or future mines, or, alternatively, designing the Oak Hill plant as a portable facility that could be used at other mines, and 4) a statement/description of the bidder's relevant experience/expertise in developing lignite/PRB coal fuel blending procedures.[24]

14. On November 17, 2004, TXU Mining hosted a mandatory pre-bid meeting with potential bidders at TXU's corporate headquarters in Dallas to discuss the

---

[21] Gerry Pearson, Deposition Testimony, January 4, 2007, 31; Discussions with Kasie Pickens.

[22] David Watkins, email to D. Akers, November 10, 2004, 1 [CGE 00015]; TXU Mining Company, L.P., "Call for Proposals: Clean Coal Key Alliance Specifications," undated, CCT-1 [CQ 00066].

[23] Call for Proposals, CCT-1 [CQ 00066].

[24] Call for Proposals, CCT-1 – CCT-3 [CQ00066 - 68].

NAVIGANT
CONSULTING

7

call for proposals.[25] Representatives from CQ and TXU attended this meeting along with representatives from other potential bidders and coal preparation consultants.[26] At this meeting, TXU distributed and discussed its "Clean Coal Technology Key Alliance Request for Bid," which outlined the bid specifications for the proposed alliance with TXU and designated a bid submission due date of December 22, 2004.[27]

15. CQ, Covol Engineered Fuels, LC ("Covol"), and SGS Minerals Services ("SGS") submitted bids to TXU.[28] Both CQ and Covol proposed dry cleaning techniques using air jigs while SGS proposed a wet cleaning process.[29] On January 4, 2005, TXU provided the bidders with Addendum No. 1 to its request for bid.[30] Addendum No. 1 outlined more specific parameters to allow for better comparability among the competing offers and amended the bid due date to January 21, 2005.[31]

---

[25] TXU Mining Company, L.P., "Clean Coal Technology Key Alliance Request for Bid No. Q041222DLW025," November 11, 2004 [CQ00069 - 71]; Key Alliance pre-bid meeting attendance list, November 17, 2004 [CGE00066].

[26] Key Alliance pre-bid meeting attendance list [CGE00066].

[27] David Watkins, Deposition Testimony, July 21, 2006, 37 – 38; Request of Bid, 2 [CQ 00077].

[28] CQ, Inc., Clean Coal Key Alliance Specifications [Bid], December 22, 2004 [CQ00106 - 7]; Covol Engineered Fuels, LC, Clean Coal Key Alliance for TXU Mining Company [Bid], Undated [TXU006741]; Kasie Pickens, Deposition Testimony, June 28, 2006, 55.

[29] CQ Bid, II-1, 7 [CQ00117, 23]; Covol Bid, 1, 4 [TXU006741, 4]; Pickens Deposition, 72 - 73.

[30] David Watkins, Email to Dave Akers containing Addendum No. 1, January 4, 2005 [CQ04895].

[31] TXU Mining Company, L.P., "Addendum No. 1 - Second Call for Proposals," [CQ00372 - 75].

NAVIGANT
CONSULTING

8

APP 9

16. After receiving CQ's and Covol's amended bids in response to Addendum No. 1, TXU distributed a second addendum to the bidders on January 27, 2005.[32] Addendum No. 2, which revised the due date to February 4, 2005, requested additional information on pre-construction air jig testing as well as additional potential lignite processing technologies. It also solicited the bidders' prior experience in coal processing.[33] On February 4, 2005, both CQ and Covol submitted revised bids in response to Addendum No. 2.[34]

17. On or around February 23, 2005, David Watkins, Senior Contracts Engineer with Capgemini Energy, L.P.[35], informed CQ that TXU had elected to continue discussions with CQ related to the proposed clean coal key alliance.[36] In the following months, TXU and CQ collaborated on several tasks to further evaluate the feasibility and potential impact of coal cleaning at TXU's lignite mines.[37]

18. In April 2005, as a part of the continued feasibility analysis, representatives from TXU and CQ visited a Department of Energy ("DOE") air jig pilot plant facility in Mississippi to perform various coal cleaning tests on

---

[32] David Watkins, Email to K. Thompson (Covol) containing Addendum No. 2, January 27, 2005 [CGE00132 - 133].

[33] TXU Mining Company, "Call for Proposals – Covol, Addendum No. 2," [undated] [CGE 00133]; TXU Mining Company, "Call for Proposals – CQ Inc., Addendum No. 2," [undated] [CQ 00397].

[34] Clark Harrison, Email to David Watkins containing CQ's response to Addendum No. 2, February 4, 2005 [CQ01573]; CQ, Inc., Response to Addendum No. 2, undated [CQ00398]; Covol Engineered Fuels, LC, Response to Addendum No. 2, February 4, 2005, [TXU 006760].

[35] Capgemini Energy, L.P. performed certain outsourced processes, including vendor management services, for TXU entities. Watkins Deposition, 8 - 9.

[36] Harrison Deposition, 19, 166 - 167.

[37] Discussions with Kasie Pickens.



samples of Texas lignite that had been extracted from TXU's Big Brown mine.[38] After analyzing the results of the Mississippi test run and performing additional financial analyses, TXU decided not to continue working with CQ on the coal cleaning project and notified CQ of its decision on July 5, 2005.[39]

## TXU's Current Coal Cleaning Operation

19. In the summer of 2005, the DOE pilot five-ton-per-hour air jig plant was disassembled in Mississippi and assembled at TXU's Thermo mine in East Texas.[40] From July through October 2005, TXU cleaned mining samples using the DOE pilot air jig plant.[41] During the time samples were being tested on the DOE pilot air jig plant, TXU internally approved the construction of demonstration coal cleaning plants at its Oak Hill and Thermo mines to prove the commercial viability of the process.[42] The Oak Hill demonstration plant, consisting of two air jigs, became operational in approximately April 2006 and has processed approximately 400,000 tons of lignite to date.[43] The Thermo demonstration plant, also consisting of two air jigs, became operational in approximately August 2006 and has processed approximately 150,000 tons of lignite to date.[44] During the summer of 2006, TXU began evaluating air table technology that appears to provide significantly higher capacity with correspondingly lower unit costs than

---

[38]Discussions with Kasie Pickens.

[39] Matt Goering, Email to Kasie Pickens, David Watkins, Gerry Pearson, Del McCabe and Don Clevenger, July 5, 2005 [TXU000206 - 7]; Discussions with Kasie Pickens; Discussions with Patrick Drake.

[40] Discussions with Kasie Pickens.

[41] Discussions with Kasie Pickens.

[42] Discussions with Kasie Pickens.

[43] Discussions with Kasie Pickens.

[44] Discussions with Kasie Pickens.



APP 11

the air jig process.[45]  It is my understanding that TXU continues to evaluate what process or processes it will employ in any full-scale commercial coal cleaning plant.[46]

## DISCUSSION

20. Through its expert Ronald G. Vollmar, CQ has claimed alleged lost profits damages totaling $6,160,528 and alleged theft of trade secrets damages ranging from $4,207,379 to $46,709,775.[47]  For the reasons discussed below, neither Mr. Vollmar's lost profits calculation nor his royalty-based calculation of purported trade secret-related damages provide an appropriate quantification of damages, if any, suffered by CQ.

### Lost Profits Damages

21. CQ's lost profits damages claim as presented by Mr. Vollmar is speculative, unsupported, and unreasonable.  Mr. Vollmar states:

> My analysis assumes:
>
> - CQ would construct two plants, Twin Oak and Oak Hill.
>
> - Both the Twin Oak and Oak Hill plants would begin construction on March 1, 2005, the approximate date of award of the contract.
>
> - Both the Twin Oak and Oak Hill plants would be constructed over an 18 month time frame beginning from the date of the contract award and commence operations the following month for a period of 6 years.
>
> - Construction costs for each plant are $5,731,323, to be incurred ratable [sic] over the construction period.

---

[45] Discussions with Kasie Pickens; Discussions with Patrick Drake, February 23, 2007.

[46] Discussions with Kasie Pickens; Discussions with Patrick Drake.

[47] Expert Report of Ronald G. Vollmar, January 31, 2007, 2.



11

APP 12

- CQ would finance 80% of construction expenditures at an interest rate of 9%. Principal and interest would be amortized over a 15 year period with the balance payable at the end of the 6 year period of operations.

- Operating expenditures related to both plants were determined based upon review of documentation used in preparing CQ's Addendum 1 bid, discussions with CQ personnel and review of information from similar projects CQ has designed and operated. I increased operating expenditures by 3% per year to account for inflation.

- Revenues for each of the facilities was [sic] based upon the tolling fee for the relevant time period as stated in Addendum 1 and the 1 million tons of feedstock per year TXU was to provide to each plant as also stated in Addendum 1.

- A discount of $0.10 per ton was applied to the tolling fee for both plants.

- Upon the completion of the 6 year operating period, CQ would sell (or otherwise recover) the equipment for book value (determined using a life of 15 years).[48]

22. Mr. Vollmar's methodology assumes that CQ would process 1 million tons of coal at each facility annually and that TXU would pay the per-ton tolling fee quoted in CQ's bid. For CQ to achieve the profits Mr. Vollmar opines were lost, it would have to 1) achieve 1 million tons of throughput annually over the six-year period and 2) design, construct, and operate two start-up facilities within the cost parameters Mr. Vollmar assumes.

23. Mr. Vollmar's explicit assumptions, as well as his numerous implicit assumptions, are unsupported and speculative considering that the alleged contract a) affirmatively prohibited either contracting party from recovering lost profits damages and b) allowed TXU to terminate the alleged contract at any time without incurring liability beyond the value of CQ's actual work performed

---

[48] Vollmar Report, 4 – 5.

NAVIGANT
CONSULTING

prior to termination.[49]  Further, Mr. Vollmar's lost profits calculation ignores that CQ never: 1) formed the legal entity that was to execute the project for the benefit of TXU, 2) obtained access to or control of the necessary real property, 3) purchased the building materials or other fixed assets, or 4) identified or hired a labor force or made any other necessary arrangements to build and operate a dry cleaning plant at either the Twin Oak or Oak Hill mine.[50]

24. Mr. Vollmar also appears to have ignored the fact that CQ had never designed, constructed or operated a dry cleaning plant.  Further, his damages calculation is dependent on other key assumptions, including the beginning date of construction, the length of construction period, and the amount and timing of construction costs as well as the structure and terms of the projects' financing.[51]

25. Additionally, although CQ did not build or operate either plant for which he purports to quantify lost profits damages, Mr. Vollmar assumes that each plant would be capable of processing 1 million tons of lignite annually for six years despite the fact that CQ had never designed, constructed, or operated a dry cleaning plant and despite design flaws that may have rendered such a conclusion unduly speculative.[52]  Likewise, all of Mr. Vollmar's cost assumptions in his lost profits calculations are based upon a combination of projected costs included in CQ's bid and operating costs from other CQ coal cleaning plants,

---

[49] Request for Bid Document [CQ00076]; TXU Standard Terms and Conditions (PLST03) [CQ00089 - 90].

[50] Harrison Deposition, 64, 104, 109, 223.

[51] Vollmar Report, 4.

[52] Vollmar Report, 5; Harrison Deposition, 25 - 26; Discussions with Kip Alderman, February 1, 2007; Report of John K. Alderman, March 1, 2007, 12.



none of which: 1) used dry cleaning technologies, 2) was located in the State of Texas, or 3) cleaned lignite.[53]

26. Further, Mr. Vollmar assumes that both the capital expenditures and operating costs would be the same for both the Twin Oak and Oak Hill plants, despite CQ personnel's acknowledgement that 1) it had not finalized the designs or purchased equipment because TXU had not decided which plant to construct first, 2) that coal is heterogeneous, even within the same mine, and 3) the technologies, and therefore the specific equipment, needed to clean the coal would vary depending on the location of the plant.[54]   Additionally, Mr. Vollmar's assumption that CQ would recover the book value of the equipment at the end of six years of operation is speculative as the equipment's fair value may have been significantly less than its book value.

27. Mr. Vollmar's lost profits calculation is simply a mathematical exercise based upon unsupported, unproven projections and irrelevant cost data, bound together by his own speculative, unsupported assumptions relative to two coal cleaning plants that TXU chose not to build.  Thus, Mr. Vollmar's lost profits calculation is speculative, unsupported, and unreasonable and should not be relied upon in determination of potential damages in this matter.

---

[53] CQ Bid, II-7, VII-3 – VII-4 [CQ00123, CQ00153 - 154].

[54] Harrison Deposition, 94, 104, 107, 109, 140.



APP 15

## Reliance Damages

28. Mr. Vollmar has not provided a quantification of any alleged reliance damages suffered by CQ related to the TXU coal cleaning project.[55] Further, I am not aware that CQ has made a claim for reliance damages. I reserve the right to analyze and respond to any reliance damages claims should CQ subsequently present such claims in this matter.

## Theft of Trade Secrets Damages

29. CQ's damages claim related to the alleged theft of trade secrets is unsupported and unreasonable. Mr. Vollmar's simplistic, unsupported assumptions and calculations grossly overstate any potential value of CQ's alleged trade secrets.

### Mr. Vollmar's Methodology

30. While Mr. Vollmar purports to calculate CQ's damages related to TXU's alleged theft of trade secrets, he fails to state his understanding of what constitutes CQ's trade secrets, stating only that "TXU misappropriated [CQ's] trade secrets related to the dry cleaning of coal."[56] Further, based upon the documents Mr. Vollmar has considered in forming his opinions and his

---

[55] I understand that a reliance damages construct attempts to restore the injured party to the position he would have held had he not relied upon the contract or promise. Defendants TXU Mining Company L.P.'s and TXU Corp.'s Brief in Support of Their Motion for Summary Judgment, *CQ, Inc., v. TXU Mining Company, L.P., et al.*, Civil Action No. 3:06-CV-322-B, February 6, 2007, 14.

[56] Vollmar Report, 5.



deposition testimony, he does not appear to have reviewed any document that would identify CQ's alleged trade secrets.[57]

31. To derive the royalty rate used to calculate alleged trade secret-related damages, Mr. Vollmar simply recreated the projected EBIT[58] portions of a spreadsheet from a TXU coal cleaning project viability analysis performed near the end of 2006[59] and divided the projected EBIT by the projected lignite feedstock for the period to calculate TXU's projected EBIT per ton of cleaned lignite at $1.59. He then attributed 25 percent of this projected benefit to the alleged CQ trade secrets and concluded that CQ is entitled to a royalty rate of $0.40 per ton.[60] Mr. Vollmar then applied his $0.40 per ton royalty rate to four volume scenarios to arrive at royalty-based damages ranging from $4,027,379 to $46,709,775.[61]

**CQ's Claimed Trade Secrets**

32. I understand that a trade secret under Texas law is defined as:

> any formula, pattern, device or compilation of information
> which is used in one's business, and which gives him an
> opportunity to obtain an advantage over competitors who do
> not know or use it . . . . It differs from other secret information in

---

[57] Vollmar Report, Exhibit D; Ronald G. Vollmar, Deposition Testimony, February 22, 2007, 69 - 70.

[58] Earnings before interest and taxes.

[59] In December 2006, TXU prepared an analysis of the economic viability of "the installation of a combination air jig and air table facility for cleaning lignite at the Oak Hill Mine." TXU, "Oak Hill Coal Cleaning [Oak Hill Business Case]," December 18, 2006, 1 [TXU 006265].

[60] Vollmar Report, Exhibit F; TXU, Oak Hill Business Case [TXU 006268 - 69].

[61] Vollmar Report, Exhibit G.



> a business . . . in that it is not simply information as to single or
> ephemeral events in the conduct of the business, as, for example,
> the amount or other terms of a secret bid for a contract . . . . A
> trade secret is a process or device for continuous use in the
> operation of the business.[62]

33. In its supplemental answer to TXU Mining's interrogatories, CQ identified ten components that ostensibly comprise its alleged trade secrets as summarized in Table 2 below.

Table 2.  CQ's Alleged Trade Secrets[63]

| No. | Alleged Trade Secret |
| --- | --- |
| 1. | Capital and operating cost estimates |
| 2. | Layout drawings and equipment lists |
| 3. | Certain flowsheet design features |
| 4. | Information re: use and benefits of and rationale for dry cleaning |
| 5. | Selection of air jig and recommendations for methods of use |
| 6. | CQ's recommendation that the cleaning plant target run-of-mine coal |
| 7. | Information re: increased mine productivity |
| 8. | Information re: rate of removal of ash-forming minerals |
| 9. | Equation/methodology for predicting mercury concentration |
| 10. | Projections of cleaning plant performance |

### *Capital and Operating Cost Estimates*

34. The information that CQ's trade secrets claim characterizes as capital and operating cost estimates are in reality CQ's bid price, on a per ton basis, to clean

---

[62] Restatement of Torts §757, comment b.

[63] Plaintiff's Supplemental Answer to TXU Mining Company's First Set of Interrogatories, December 1, 2006; CQ Bid, II-3, 4, 7 - 10, 13 - 15, 17, VI-1 - 7, Appx. II-3 [CQ00119 - 120, 123 - 126, 129 - 131, 133, 144 - 150, 170 - 173].



TXU's lignite at the proposed CQ-owned and operated cleaning plant.[64]  Even assuming that this alleged trade secret meets the legal standard for trade secrets, it has little to no economic value to TXU for numerous reasons.

35. By definition, CQ's bid price is not reflective of TXU's cost to undertake the proposed project, but rather includes CQ's estimated cost, which could be less or more than TXU's cost, and CQ's profit margin.  Additionally, Covol's bid also contained capital and operating cost data on a more identifiable basis than did CQ's bid.[65]

36. Both the cleaning plant's capital costs and operating costs are highly dependent upon the type of operation designed and constructed.[66]  Thus, CQ's bid prices provided little benefit to TXU since the facilities that TXU has constructed vary markedly from those proposed by CQ.[67]  Further, TXU relied upon Kip Alderman, a coal cleaning consultant, to assist with the cost estimates for the coal cleaning projects it actually undertook.[68]

### *Layout Drawings and Equipment Lists*

37. CQ contends that its layout drawing and equipment lists constitute trade secrets that TXU has misappropriated.[69]  However, TXU's current and projected coal cleaning facilities are not arranged using CQ's proposed design and include

---

[64] CQ Bid, VI-4 [CQ00147].

[65] Covol Bid, 6 [TXU006746]; Covol Engineered Fuels, LC, Response to Addendum No. 1, January 21, 2005, 2 [TXU006759].

[66] David Akers, Deposition Testimony, December 14, 2006, 18-19; Harrison Deposition, 94.

[67] Affidavit of Kasie B. Pickens, January 25, 2007, 6, 7.

[68] Pickens Affidavit, 4.

[69] Plaintiff's Supplemental Answer to First Set of Interrogatories.



equipment not proposed by CQ and do not include some equipment that CQ proposed.[70] Rather, TXU's plant layouts are based on designs provided by Dick Snoby, president of Allmineral Llc ("Allmineral"), the manufacturer of the All-Air Jig, and Kip Alderman, a coal cleaning consultant retained by TXU.[71] In fact, Mr. Snoby had discussions with CQ as CQ was preparing its bid for the proposed TXU project and provided generic layout coal cleaning plant drawings and recommendations to CQ.[72]

38. It appears unlikely that TXU would be willing to pay CQ any royalty amount for this alleged trade secret in light of the fact that Mr. Snoby willingly provided layout drawings at no charge to potential buyers of his company's equipment and that TXU retained—and compensated—Mr. Alderman to provide assistance in designing the plant.[73] Had TXU deemed CQ's layout drawings and cost estimates relevant and valuable for its use, one would expect that TXU would have designed its plant(s) using those drawings and cost estimates rather than seeking professional assistance from Messrs. Snoby and Alderman.

### *Flowsheet Design Features*

39. CQ claims that three "design features" are misappropriated trade secrets: 1) bypassing "all high-quality coarse lignite," 2) minimizing crushing, and 3)

---

[70] Pickens Affidavit, 6 - 8; CQ Bid, 11-14 [CQ00130].

[71] Affidavit of John K. Alderman, January 25, 2007, 2 - 3; TXU Presentation: Dry Cleaning for Texas Lignites, 30; Coal Preparation for North Dakota Lignite, 34.

[72] Snoby Deposition, 118 - 121.

[73] Snoby Deposition, 102 - 103; Richard Snoby, Letter to David Akers re: Allair Jig information and flowsheet [AM043 - 044]; Richard Snoby, Email to Cliff Raleigh re: Allair Jig Plant Layouts, April 19, 2005 [AM045]; Alderman Affidavit, 1; Pickens Affidavit, 5.

